**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALTER DE SCHUTTER, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> TELADOC HEALTH, INC., JASON GOREVIC, and MALA MURTHY, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Plaintiff Walter De Schutter ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Teladoc Health, Inc. ("Teladoc" or the "Company"), and information readily obtainable on the

Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Teladoc securities between October 28, 2021 and April 27, 2022, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

6.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

2

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was economically damaged thereby.

8.      Defendant Teladoc provides virtual healthcare services in the U.S. and internationally through Business-to-Business ("B2B") and Direct-to-Consumer ("D2C") distribution channels. The Company offers its customers various virtual products and services addressing, among other medical issues, mental health through its BetterHelp D2C product, and chronic conditions.

9.      Defendant Teladoc is a Delaware corporation with principal executive offices located at 2 Manhattanville Road, Suite 203, Purchase, New York 10577. Teladoc's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the trading symbol "TDOC."

10.     Defendant Jason Gorevic ("Gorevic") has served as Teladoc's Chief Executive Officer at all relevant times.

11.     Defendant Mala Murthy ("Murthy") has served as Teladoc's Chief Financial Officer at all relevant times.

12.     Defendants Gorevic and Murthy are sometimes referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

3

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.     The Company and the Individual Defendants are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background Information

17.     Teladoc provides virtual healthcare services in the U.S. and internationally through B2B and D2C distribution channels, serving employers, health plans, hospitals and health systems, insurance and financial services companies, and individual members. The

Company offers its customers various virtual products and services addressing, among other medical issues, mental health through its BetterHelp D2C product, and chronic conditions.

18.     Teladoc touts itself as "the first and only company to provide a comprehensive and integrated whole person virtual healthcare solution that both provides and enables care for a full spectrum of clinical conditions[.]" Despite recent market concerns over new entrants to the telehealth field, such Amazon and Walmart, the Company has continued to assure investors of the Company's dominant market position in the industry.

## Materially False and Misleading Statements

19.     On October 28, 2021, the day after Teladoc held a conference call with investors and analysts to discuss the Company's third quarter 2021 results (the "Q3 2021 Earnings Call"). On that call, Defendant Gorevic provided preliminary FY 2022 revenue guidance of $2.6 billion, while simultaneously downplaying anticipated headwinds to the Company's chronic care business, stating, in relevant part:

> I want to provide some initial perspective on our expectations for 2022. As you know, it's not our typical practice to comment on forward outlook at this point in the year. But we believe the additional color is appropriate given our insights at this stage of the selling season and our outlook on consolidated revenue growth for next year. First, we are as confident as ever in our multiple levers for growth in 2022 and beyond. Our unique ability to deliver longitudinal, Whole-person care is a significant competitive advantage. And our leading position in all B2B and DTC channels enables us to fuel continued growth.

> Given our insights at this stage of the selling season, our preliminary outlook for consolidated revenue next year is approximately $2.6 billion … Chronic care is just one of those levers for growth and is increasingly converging with others … However, as we work through the 2022 planning process, we expect to be more conservative about growth expectations for standalone Chronic Care.

> Our preliminary outlook assumes standalone Chronic Care revenue will grow approximately 25% to 35%. And we believe strongly that our Chronic Care capabilities will also continue to unlock growth across our integrated suite of products and solutions. Our Whole-person care approach is clearly resonating with clients and consumers as their expectations for virtual healthcare delivery

continue to move up the value chain and expand from transactional episodic demand toward integrated longitudinal care.

20.     Also on the Q3 2021 Earnings Call, in response to a Credit Suisse analyst's request for more color on Defendants' conservative view of chronic care for 2022, Defendant Gorevic stated, in relevant part:

> [W]hen we talk about Chronic Care management and our outlook, we've done a lot of work to make sure that we're very focused on the discipline that we bring and have always brought to our management of the pipeline and are forecasting process … We've -- I would say have been very successful in selling into the health plan channel over the course of this year and our pipeline's still looks strong with new opportunities. Many of those opportunities, either the existing sales that we've made or the ones in our pipeline are the permission and the partnership with the health plan to go sell to their self-insured clients.
>
> That takes a couple of years to unlock the full value of it because you have to go through the renewal cycle and the selling cycle to those self-insured clients. And so, we're trying to be very realistic about the sort of on-ramp of those clients in the health plan segment. With respect to the employer market, that's a market where our products are extremely attractive. And historically, we've been very successful at selling into the employer market directly when we sell directly to large employers. That's a market where the benefits managers have, I would say, paused over the course of this year more than we've seen it in the past and it's really due to COVID and them being focused on the pandemic and return to work.

21.     Despite expressing measured caution over the staggered "on-ramp" of certain clients and the ongoing COVID-19 pandemic, Defendant Gorevic continued by assuring investors, in relevant part:

> As I talked to our employer sales team, they see th[e employer market] picking up substantially as we get to the end of the year. And people are starting to get back to the office. And the benefits manager is starting to think about more of a return to normal. And so, they are optimistic as we look into next year's selling cycle.

22.     Similarly, also in response to the Credit Suisse analyst, Defendant Gorevic addressed potential slowdowns in two other chronic care channels, while again simultaneously assuring investors of the limited impact of those market conditions:

And then there are two channels that I would say are just moving a little more slowly than we had originally anticipated. And again, we want to be conservative in our outlook. The broker channel, we had high expectations and we're just starting to see that pick up now. It took a while to educate the brokers.

We have a large distributed broker network. And it took a little while to educate them on a product set that they really didn't have access to before. We're now starting to see that pick up substantially and we're excited about next year's selling season for that. And then lastly, International. I think the international markets, we have to go through some both regulatory hurdles in terms of local certifications and approvals, but also localizing our products to various international markets. And we're doing that in a fairly methodical approach, market-by-market. So, I think we will see growth internationally, but we don't have, really, anything in our plan for next year on a substantial basis.

And then maybe the last thing I'll say is that's been -- I would say positively offset by our growth in the hospital and health system market where we've, we've noted before that we've seen especially risk-bearing hospitals really lean into the Chronic Care solutions. And that's going better than we had expected. So, when you put all of that together and we take, I would say critical look at the pipeline and our forecast, that's where we landed on that 25% to 35% outlook. Again, that's a contributor to our overall outlook of approximately 2.6 billion in revenue next year.

23.    On February 22, 2022, Teladoc issued a press release announcing the Company's fourth quarter ("Q4") and FY 2021 results. That press release highlighted "*[f]ull year 2022 Revenue guidance of $2.55 to $2.65 billion, representing 25% to 30% growth*" (emphasis in original), and provided FY adjusted EBITDA guidance of $330 - $355 million.

24.    That same press release quoted Defendant Gorevic, who stated, in relevant part:

"Teladoc Health took a huge step forward in bringing true whole-person care to life for consumers and clients in 2021 … We successfully delivered against performance metrics [and] solidified our position as the partner of choice for our clients … Teladoc Health is clearly differentiated by the breadth and depth of our offerings, an integrated suite of virtual care services that connect individuals with chronic, primary, acute and specialty care. We saw meaningful growth and penetration across several key areas of our business, [including] in mental health through [*inter alia*] BetterHelp in the [D2C] space …"

"… We … are equally excited about our role in 2022 and beyond as we continue to innovate, further evolving whole-person care, introducing new services like

Chronic Care Complete, expanding into new markets and deepening our relationships with our clients and consumers[.]"

25.     That same day, Teladoc held a conference call with investors and analysts to discuss the Company's Q4 and FY 2021 results (the "Q4/FY 2021 Earnings Call"). On that call, Defendant Gorevic expressed his confidence in meeting Teladoc's revenue guidance for FY 2022, stating, in relevant part:

> For [FY 2022], we expect revenue to be in the range of $2.55 billion to $2.65 billion, representing growth of 25% to 30%. Our expectations for strong growth are a result of the broad-based momentum we continue to see across our suite of products and services and across geographies. We have over 90 million total individuals with access to the Teladoc platform today, and we see a significant opportunity for long-term growth by expanding our relationships and going deeper with our existing clients and members as we execute against our key strategic priorities across primary care, mental health and chronic care solutions.

26.     With respect to Teladoc's revenue and adjusted EBITDA guidance for FY 2022, Defendant Murthy stated the following on the Q4/FY 2021 Earnings Call:

> For [FY] 2022, we expect revenue to be in the range of $2.55 billion to $2.65 billion, representing growth of 25% to 30% over the prior year. We expect total membership of 54 million to 56 million members, representing growth of 1% to 5% year-over-year, with the remainder of revenue growth driven by expanding revenue per member driven both by increased product penetration and product mix.
>
> We expect adjusted EBITDA in 2022 to be in the range of $330 million to $355 million, representing a 12.9% to 13.4% adjusted EBITDA margin and an expansion of approximately 90 to 140 basis points over 2021 after normalizing for last year's purchase price accounting benefit. We expect total visits in 2022 to be between 18.5 million and 20 million visits, representing growth of 20% to 30% over the prior year.

27.     Additionally, also on the Q4/FY 2021 Earnings Call, in discussing "the expected cadence of revenue and adjusted EBITDA growth over the course of [FY 2022,]" Defendant Murthy stated, in relevant part:

On the revenue side, we expect the timing of new chronic care client onboarding to be more heavily weighted towards the second half of this year. This includes the launch of large new health plan clients signed over the past several months … which are scheduled to onboard in the second half of this year. We, therefore, expect to see strong sequential growth in revenue over the course of the year. Specific to the second quarter, we expect an approximate $40 million to $50 million step-up in revenue from 1Q to 2Q.

On the expense side, we normally see higher engagement marketing spend in the first half of the year as we prepare to onboard new clients and members. It's also typical for us to see higher advertising spend early in the year as we take advantage of lower media pricing in the market following the conclusion of the more expensive holiday season. We expect that to be the case again this year, as we have seen a more advantageous media buying landscape early this year, which has resulted in a slightly lower customer acquisition cost.

This will impact the quarterly cadence of adjusted EBITDA, and we expect will result in a significant margin expansion progression over the course of 2022, particularly in the second half due to our expected revenue and enrollment ramp for the chronic care programs launching later this year as well as the typical seasonality of advertising spend over the course of the year.

28.     On the same call, Defendant Murthy also assured investors of Defendants' visibility into Teladoc's second half of FY 2022 results, stating, in relevant part:

It's important to note that the revenue and EBITDA ramp described is not dependent on significant new sales. The deals mentioned are contracts that have been signed over the past several months, but are disproportionately scheduled to onboard in the second half [of 2022]. And we, therefore, have good visibility into the second half revenue and EBITDA progression.

29.     On February 28, 2022, Teladoc filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2021 (the "2021 10-K"). That filing assured investors of the Company's continued dominant market position and unique competitive strengths, stating, *inter alia*:

We believe that Teladoc Health is the leading global virtual healthcare provider because of our strong competitive advantages that address the most pressing challenges and trends in the delivery of healthcare around the world. We believe our history of innovation and long-standing operational excellence provide us with significant first-mover advantages, and we continue to invest and expand our services and geographic footprint globally. As the first comprehensive virtual

healthcare company providing whole person care at scale, we have pioneered solutions and created what we believe are collectively the telehealth industry's first and only offerings of their kind.

*      *      *

We believe that we are the first and only company to provide a comprehensive and integrated whole person virtual healthcare solution that both provides and enables care for a full spectrum of clinical conditions, including wellness and prevention, acute care, chronic conditions, and complex healthcare needs.

30.    With respect to Teladoc's BetterHelp business, the 2021 10-K stated, in relevant part:

We plan to continue driving growth through investments in our D2C channels … BetterHelp is the leader in the D2C therapy market, both in terms of the number of individuals enrolled and the number of providers who provide services on the platform. The scale of our data and provider network, powered by our data science capabilities, creates a competitive advantage for us in providing an optimal match of an individual with a provider, increasing the rate of success in therapy. We leverage diverse customer acquisition channels and increased organic sources of traffic, which reduces dependence on any single source of member acquisition. Even with our strong historical growth, we believe there is substantial untapped growth potential, both domestically and internationally, as almost half of BetterHelp members have never sought therapy before.

31.    With respect to Teladoc's chronic care business, the 2021 10-K stated, in relevant part, that "[o]ur chronic care programs are one of the key components of our whole person virtual care platform that we believe position us to drive greater engagement with our platforms and increased revenue."

32.    Appended as exhibits to the 2021 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Individual Defendants certified that "[t]he [2021 10-K] fully complies with the requirements of Section 13(a) or Section 15(d) of the [Exchange Act], as amended[,]" and that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

33. The statements referenced in ¶¶ 19-32 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) increased competition, among other factors, was negatively impacting Teladoc's BetterHelp and chronic care businesses; (2) accordingly, the growth of those businesses was less sustainable than Defendants had led investors to believe; (3) as a result, Teladoc's revenue and adjusted EBITDA projections for FY 2022 were unrealistic; (4) as a result of all the foregoing, Teladoc would be forced to recognize a significant non-cash goodwill impairment charge; and (5) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**The Truth Emerges**

34. On April 27, 2022, post-market, Teladoc issued a press release announcing its Q1 2022 financial results, including revenue of $565.4 million, which missed consensus estimates by $3.23 million, and "[n]et loss per share of $41.58, primarily driven by [a] non-cash goodwill impairment charge of $6.6 billion or $41.11 per share[.]" In addition, the Company revised its FY 2022 revenue guidance to $2.4 - $2.5 billion, down from previous guidance of $2.55 - $2.65 billion, and revised its FY 2022 adjusted EBITDA guidance to $240 - $265 million, down from previous guidance of $330 - $355 million, "to reflect dynamics we are currently experiencing in the [D2C] mental health and chronic condition markets." Specifically, according to Defendant Gorevic, as quoted in that press release:

> In the D2C mental health market, higher advertising costs in some channels are generating a lower-than-expected yield on our marketing spend. In the chronic condition market, we are seeing an elongated sales cycle as employers and health

plans evaluate their long-term strategies to deliver the benefits and care that their populations need.

35.    Later that day, Teladoc held a conference call with investors and analysts to discuss the Company's Q1 2022 results. In his prepared remarks on that call, Defendant Gorevic stated the following regarding how increased competition, lower growth, and lower yield from marketing spend were negatively impacting the Company's BetterHelp results:

> Over the past several weeks, we've seen lower-than-expected yield on marketing spend for BetterHelp, which is a reversal of the trends we experienced exiting 2021 and in the early part of 2022. One example of this is paid search advertising, where we've seen a notable increase in rates for keywords associated with online therapy.

> We believe the biggest driver of this dynamic is smaller private competitors pursuing what we think are low- or no-return customer acquisition strategies in an attempt to establish market share.

> Some of those same providers are also exploiting the temporary suspension of certain regulations associated with the national health emergency concerning the prescription of controlled substances. We believe these strategies are unsustainable in the long-term. This dynamic is likely to persist at least throughout the remainder of this year, however, resulting in growth and margin contribution from BetterHelp that is below our expectation in February.

*      *      *

> [G]iven the persistency of these trends over the past several weeks and the broader economic backdrop, we've incorporated this updated view into our forward outlook, including an assumed 10% lower revenue yield per dollar of ad spend for the full year.

36.    Likewise, Defendant Gorevic stated the following regarding how increased competition and other factors were negatively impacting the Company's chronic care results:

> [W]e're also seeing our chronic care sales pipeline developed more slowly than anticipated. Last October, we discussed two trends in the marketplace that we saw leading to an elongated selling cycle. The first was in the employer market, where we saw benefit managers focused on COVID and return to work, which we felt was contributing to a longer decision-making process. The second was a large

pipeline of health plan deals that were simply harder to predict when it comes to timing given the size and complexity of those clients.

At the beginning of this year, we were encouraged by very strong fourth quarter bookings and a robust late-stage pipeline. However, as we progressed through the first part of the year, we're seeing clear signs of the slower bookings pace continuing.

In addition to the factors we discussed last fall, we're seeing clients inundated with a number of new smaller point solutions, which has created noise in the marketplace … [W]e are in the process of taking a closer look at some of these forces that are impacting the near-term conversion of pipeline to revenue, and we'll continue to make adjustments as necessary to address them.

… [W]e're not seeing deals progress at the pace that we expected.

37.     Additionally, Defendant Gorevic revealed that BetterHelp had played a

disproportionate role in necessitating Teladoc's revised FY 2022 guidance, stating, *inter alia*:

When comparing the impact to guidance from the items we've just discussed, approximately three quarters of the reduction to our 2022 revenue outlook is driven by lower expected growth at BetterHelp with the remainder primarily attributed to the lower expected revenue from our suite of chronic care products.

For adjusted EBITDA, approximately two thirds of the reduction is driven by lower yield on advertising spend from BetterHelp. The remainder of the revision is driven primarily by our lower chronic care revenue outlook as well as a modest increase in our assumption for wage growth due to higher inflation as we grow our headcount in technology and development.

As a result of these updates, we now expect revenue of $2.4 billion to $2.5 billion and adjusted EBITDA of $240 million to $265 million for fiscal year 2022 … We are not providing today any guidance with respect to periods after 2022, and we're evaluating whether there will be effects to our long-term revenue growth outlook.

38.     On the same call, in her prepared remarks, Defendant Murthy stated the following

regarding Teladoc's $6.6 billion non-cash goodwill impairment charge:

Net loss per share in the first quarter was $41.58 compared to a net loss per share of $1.31 in the first quarter of last year. Net loss per share in the first quarter includes a non-cash goodwill impairment charge of $41.11 per share or $6.6 billion. The goodwill impairment was triggered by the sustained decline in Teladoc Health share price with the valuation and size of the impairment charge

driven by a combination of recent market-based factors, such as an increased discount rate and decreased market multiples for a relevant peer group of high-growth digital health care companies as well as updates to our forecasted cash flows consistent with the revised guidance disclosed today.

39.     On April 28, 2022, investor news resource *Seeking Alpha* published an article entitled "Teladoc draws downgrades after 1Q revenue miss[,]" noting that the Company's "shares have lost more than a third of value to reach a 52-week low on Thursday after the telehealth company missed Street forecasts for its 1Q 2022 revenue prompting many analysts to downgrade the stock[,]" while citing analysts from Citi, Credit Suisse, and Wells Fargo, stating:

> The financials "reveal cracks in TDOC's whole health foundation as increased competitive intensity is weighing on growth and margins," Citi analyst Daniel Grosslight said after discussions with the management.

> The issues were particularly notable in the company's fastest growing direct-to-consumer mental health and chronic care segments, which, according to the analyst, were expected to drive growth over the next three years.

> Despite the reluctance to make widespread changes to the thesis based only on one poor quarter, Grosslight said: "We are doubtful that we will see the competition-driven headwinds abate anytime soon."

> Expecting Teladoc (TDOC) shares to trade in a narrow range over the next twelve months, the analyst downgrades the stock to Neutral from Buy, with the price target lowered to $43 from $115 per share, implying a downside of ~23.2% to the last close.

> Credit Suisse analysts led by A.J. Rice downgraded Teladoc (TDOC) to Neutral from Outperform, noting, among other things, the company's underwhelming full year outlook. The price target slashed to $35 from $114 per share indicates a downside of ~38% to the last close.

> "TDOC is seeing an elongated sales cycle as employers and health plans evaluate their long-term strategies to deliver the benefits and care their populations need," the team noted.

> The analysts argue that, as a result the company has lowered its estimate for revenue yield for dollar of ad spend and recognized a $6.6B goodwill impairment to reflect ~75% and ~66% decline in revenue and EBITDA, respectively.

Q1 results disprove its Bullish thesis and signals "significant uncertainty for the trajectory of revenue and margins over both the near and intermediate term," Wells Fargo's Stephen Baxter and Stan Berenshteyn wrote as they downgraded the stock to Equal Weight from Overweight. The price target lowered to $40 from $104 per share implies a downside of ~29% to the last close.

40.     On this news, the Company's stock price fell $22.48 per share, or 40%, to close at $33.51 per share on April 28, 2022, damaging investors.

41.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of the Company during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

48. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NYSE, and was covered by market analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g) Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

49.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53.     During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.     The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

55.     The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

56.     Individual Defendants, who were senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

57.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

58.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

59.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

60.     By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## **COUNT II**

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

61.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

63.     As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

64.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were each a "controlling person[]" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

65.     The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and being a director of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

66.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 2, 2022                          Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*